Twin City Fire Insurance Co. The district court applied two New York cases in finding that the domicile of the insured was the best proxy for the party's intent with respect to the principal location of the insured risk. But even those New York cases, if they applied here, would not lead to that conclusion because those New York cases involved a situation where there was an insured with one particular place of domicile, and that place of domicile was identified in the insurance policy. And then the risks associated with the insurance activities were scattered among a number of different states. And the court found that, under those circumstances, the New York courts found that the clearly identified place of the insured's domicile was essentially the one state that everybody contemplated at the time of contracting, and so was the best proxy for the party's understanding with respect to the principal location of the insured risk. Here, the policy identifies the insured as George K. Baum, New York, New York. It says nothing about George K. Baum being a Missouri company that's only using its New York address to avoid Missouri taxes. Let's assume you're right. I think even under New York law, you lose because you've waived a defense. New York law says that you have to raise your defenses at the first opportunity, or you waive them. And you didn't raise them, either in the early notice several years before, or didn't even raise it in the litigation until shortly before you answered. And it appears under New York law that that means you waived the defense. Am I wrong? Yes, Your Honor, you are wrong for two reasons. First of all, New York law makes abundantly clear, and no one disputes that, there is no waiver analysis to be done where the coverage defense that's being asserted is found in the insuring agreement or one of the exclusions to the policy. There simply can be no waiver. Here, the notice as soon as practicable is found in the insuring agreement. The insuring agreement imposes two conditions on notice. First, notice has to be given as soon as practicable, and it has to be given no later than the end of the policy period or a grace period. It's undisputed that the second provision can't apply here, the second prong, because this is a claim made after the policy period that relates back. But there's no basis in the law or in the policy for reading out the as soon as practicable language from the insuring agreement. So there is no possibility of waiver. But the second reason it's wrong is that it's an incorrect statement of New York law. New York law, there are cases, there's really only one New York Court of Appeals case that's even involved here, it's the Ceruzzi case. The Ceruzzi case says something to the effect of what Your Honor just said, but it is applying a New York statute that only applies, it implies heightened disclaimer obligations in the context of personal injury, wrongful death cases. But we've cited six cases, and you can begin with the Olin case upon which Balmer lies. The Olin case beginning at the bottom of page star 2 and going through the top of page star 3 lays out the New York case law that provides that where the insurance company identifies what appears to be the dispositive basis for denying coverage, but then expressly reserves all of the rights, then there can be no waiver. It's only where the insurance company... Well, but it talks about you have to be, it has to be specific. There's some kind of language in there. Go ahead, your time's running out. What it says is that if there is a clear and express reservation of all other defenses, then there can be no waiver. And if you look at the Heiser v. Union Central Life Insurance Company case, the language there that was found to preclude waiver was this declination is not to be construed to preclude any defenses to this claim, not expressly indicated herein, and the company reserves the right to use any and all such defenses. That language was found... Well, but the Second Circuit has held that New York courts have firmly and repeatedly rejected generalized language of a sort used by your company here. Say, New York law, quoting New York law, conclusively deems an insurer to have intended waiver when an insurer purports to reserve the insurer's rights to rely on additional reasons for disclaimers should they become apparent in the future. You're talking about the Amaro Realty case? I think so. I believe that is the Amaro Realty case. I'll find it. Go ahead. Well, the line the Amaro Realty case drew was where the reservation of rights is to assert any defenses that become known in the future. That's State of New York v. Amaro Realty Court. Right. That case states that where the reservation of rights is only to assert any defenses that become known in the future, then that can express the intent to waive any defenses known at the time. But there are six cases that we've cited coming after Amaro Realty. Amaro Realty makes clear that it is not addressing a situation where there's a general reservation of all other rights. And there are six cases, beginning with Globacon Group, the Globacon Group from the Second Circuit in 2006, 15 years after Amaro. Globacon calls that argument that Your Honor just articulated frivolous in this context because the burden of proof is on the insurer to prove that the insurer clearly manifested its intent to waive any other coverage defenses. And where the insurer expressly reserves the right to assert any other coverage defenses in the future, that is fatally inconsistent with the insurer's ability to prove that the insurer clearly manifested its intent to waive any other coverage defenses. If you say, I'm expressly reserving the right to assert other coverage defenses, you can't be said to have clearly manifested your intent to waive them. And that same ruling applies in the Home Decor Furniture case, the Mount Vernon Fire Insurance Company case, Heiser v. Union Central that uses almost the precise language that we used here, the Lugo case that uses language almost exactly like was used here, and the First Advantage Litigation Consulting case that actually comes after the Estee Lauder opinion upon which Balmer lies. So the State of New York v. Amaro Realty Holding does not apply here. In fact, it counsels in favor of Twin City here because it says that where there's a general reservation of rights, there can be no waiver. And what Twin City said in its letter, and this is in the Joint Appendix, Volume 4, page 671, Twin City continues to reserve all rights in this matter and nothing in the letter should be construed as a waiver of any rights, privileges, and or defenses that Twin City may have under the policy, including the right to supplement and or deny coverage as circumstances warrant. Twin City, of course, considers all such rights fully and mutually reserved. And it's also worth noting that what Twin City did was it identified what it thought was a dispositive reason for denying coverage and invited the insured to give it any other information it would consider it. The insured did so, and the insurance company did reconsider its position. It's exactly what the courts would want an insurance company to do, not fill a letter with every possible reason why you might deny coverage in the future, identify what appears to be a dispositive issue, invite the insured to comment, and then reconsider where appropriate. I see my time is up. Thank you. Thank you, Your Honor. Good morning, Mr. Thumm, is it? Thumm. Thumm? Okay, good morning. Good morning. I am here. My name is Terry Thumm. I'm here representing the appellee and cross-appellant, George K. Baum and Company, who I'm going to refer to as GKB. George K. Baum urges the court to affirm the district court's judgment that under applicable Missouri law, the timing of GKB's notice of the derivatives litigation does not preclude coverage, and we urge the court as cross-appellant to reverse the district court's entry of judgment that a single retention of $3 million applies to the derivatives litigation and the IRS investigation and remand to the district court with direction to enter judgment that a single retention of $1 million applies to both claims. Speaking first to the choice of law issue, first of all, there's no indication that there's any choice of law provision in the policy. The New York endorsement that was added because George K. Baum chose to use a New York address on the policy to avoid surplus lines taxed, that purpose only, does not include a choice of law provision. It doesn't address timing of notice. It doesn't address the effect of timing of notice. Those are the issues that are specific to the contract that are at issue. The only thing it addressed, the New York endorsement, was the location of the notice on both sides. The location needed to be in New York, but there's no dispute here. There's no dispute or issue with respect to location of the notice. So with no choice of law provision, that throws us back into the Section 188 Restatement Factors Analysis, which the court went through. We believe the most significant relationship here is clearly Missouri. The place of contracting is the place where the policy was issued to. There's no dispute that it was issued to Baum's broker, Lockton, in Missouri, by the underwriters in Chicago from the insurance company. The place of negotiations, primarily Missouri, where the only face-to-face meeting took place between the insurance company's representatives and the broker and Baum occurred in Missouri. The place of performance, that's not where the place of the notice is to be given. It's the place where the insurance company is to perform its indemnity obligation. They're going to be paying defense costs. Those defense costs are going to be paid to Baum in Missouri. The location of the subject matter of the contract, it's sort of like the location of the insured risk. We have Baum as 100 employees. The subject matter are the employees who are being insured under this professional liability policy, and their activities are being insured. We have 100 in Missouri at the time the policy was issued, 80 in Colorado, four in New York, and token numbers in the other offices they have. What's our standard of review of the district court's 188 analysis? It's de novo. And it's an issue of a de novo review. Let me ask you this. Twin City argues, and the district court points it out to some degree, that there are New York endorsements in here, New York language and law in here. Is there anything in there in the agreement that talks about Missouri law  There's no Missouri endorsement. The only specific law language is New York? Well, there's no Missouri endorsement, and there's no reference to Missouri law in the policy. There's no reference to New York law either other than the mandatory endorsement, which, as to our issue, just addresses location of notice, and that's all. It doesn't say New York law applies. If Twin City wanted New York to apply, they could have included that in the policy, and they didn't. So this throws us back into the most significant relationship test, where we have a Missouri-insured, headquartered in Missouri, domiciled in Missouri, and Twin City is not a New York insurance company either. It borrows language from New York. I'm asking, does it borrow language from Missouri? No, no, Your Honor. Also, under the Section 188 factors, you are to consider Section 6 factors, which include public policy of the respective states. They have an interest. Missouri has a strong public policy in favor of their own prejudice rule to avoid what they call a technical way out of the policy. The idea is to avoid the situation where an insurer can get out of its indemnity obligation based on a technicality when there's been no prejudice. Twin Cities admitted they agreed not to contest that there was on the prejudice issue here, so there was no prejudice. What interest does New York have in applying the New York rule to a Missouri-insured, on a policy issued by a Connecticut insurer, to void coverage to a Missouri-insured? There isn't any. And what's more, even New York has changed its policy. In 2009, by statute, they changed the rule for policies issued from 2009 forward with respect to the prejudice rule. From this point forward, for those policies, the prejudice rule applies, even in New York. So New York has no dog in this fight, and Missouri does, with respect to its Missouri headquartered insurer. Speaking on the waiver issue, Mr. Lemley is correct that there's a series of New York cases after the Amarillo case. The Amarillo case in DICTA said we're not addressing the situation where there's a broad reservation of rights but no specific defense of notice. We're not addressing it. A series of New York trial courts, district courts, after that have seized on that and said if you do have a broad reservation of rights, we will deem that not to be noticed, a waiver of the late-notice defense. However, you're a federal court sitting in diversity. You're guided by state appellate court decisions. In 2009, we have the Estee Lauder case versus One Beacon Insurance Company. It's a New York appellate division case, and it directly overturned, overruled, contradicted that series of New York federal district court cases on the issue of what's the effect of a general waiver of reservation of rights on waiver of a late-notice defense? And they said notwithstanding the general waiver that was in place in that case, you have a legal duty. It's not a contractual duty. It's a legal duty to specifically disclaim late notice if you're aware of it at the time or your original disclaimer. You can't contract your way around that by a general reservation of rights language. And if you don't specifically notify the insurer that you've got a late-notice defense, it's deemed waived as a matter of law. That decision came down the New York appellate division in 2009. It's characterized by Mr. Lemley as an outlier, but it's not. It continues to be cited. It continues to be good law. There's a 2011 appellate division case called a growl that's in our brief. It's a life insurance case. It's not a bodily injury or wrongful death case. It's cited for the proposition that the failure to assert other defenses, the initial disclaimer, constitutes a waiver of those defenses. Most recently, it was cited in December of 2013 by the Second Circuit for the proposition that an insurer's written disclaimer must promptly apprise the claimant with a high degree of specificity on the grounds that it's or you waive your right to rely on that ground in excluding coverage. That's the Atlantic Casualty v. Coffee case. There's no citation yet, but it's the Federal Appendix, Second Circuit, December 11, 2013. So that's still good law, and under New York law, they waive their late-notice defense by not specifically asserting it. And I will add that they only asserted it and changed their position on the relation back issue after we filed suit. It wasn't after due consideration. We filed suit and challenged them solely on that basis, and that's when they did their 180 and changed position. Speaking next to our cross appeal, which is an interesting issue, it's really an issue of first impression. Neither side cites any law on it because there is no law. It's the unusual situation where you have a two-tier retention provision in the policy. It's $3 million self-insured retention if the claim arises out of the underwriting or selling of municipal bonds, and it's $1 million if it arises out of anything else that's otherwise covered by the policy. So you've got a two-tier situation. Did the lawyers actually approve something like that for their claim? I doubt the lawyers reviewed that endorsement at the time it was issued. But the intent, obviously, is to protect the insurer, to give them additional protection from the risk by a higher retention in the event of a claim that involves the underwriting of municipal bonds. The issue is how does that apply to a claim that relates back? And there's no law on this. We have no dispute that the original IRS investigation claim that was noticed in 2003, the original claim that gave rise to all this, involved both the underwriting function because the IRS was investigating the sizing of these pool financings. You had to have some assurance that 95% of it would be loaned out within three years, and it goes to sizing. So that's an underwriting function. They also were investigating their role as bidding agent, placing the proceeds from these bond financings before they're used in GICs, Government Guaranteed Investment Contracts, or other derivatives, so that those funds would be invested until they're used within the safe harbor requirements imposed by the IRS to avoid them being deemed arbitrage bonds. So they're two separate functions, and they played these functions, and both functions were investigated. So we can see the $3 million self-insured retention applies to the original case. That's not the issue. The issue is which one applies to the derivatives litigation. It was filed five years later outside the policy. So which applies to the IRS? You agree that the $3 million retention applies because that did involve bonds, which function as underwriter of bonds in part. It also involved their function as bidding agent on these GICs and derivatives. Five years later now we have the derivatives litigation, which, and the only wrongdoing that's alleged in the derivatives litigation involves their role as bidding agent. That's all. Their role as underwriter, their role as the sizing issue that the IRS investigation, is not an issue in the derivatives litigation. So if you take the derivatives litigation. Where do we go for the proposition, which you're taking as a given, that the function of a bidding agent is not underwriting or selling? Well, it's not underwriting or selling municipal securities or municipal bonds. What they're selling or helping, actually they're placing it for bid, are derivative securities that aren't bonds. They're guaranteed investment contracts. They're not bonds. They're something else. They're investing bond proceeds in something else until the bond proceeds are used. Once the funds have been raised from the bond issuance. So if you take the derivatives litigation by itself, I think it's pretty clear it would be the $1 million self-insured retention would apply, because there's no wrongdoing alleged with respect to bonds, role as underwriter of municipal bonds. It's strictly the role as bidding agent, which would be subject to the $1 million retention. So the question is, and that role as bidding agent, and they're alleging bid rigging in their role as bidding agent, that's the function, the interrelated wrongful acts that cause the 2008 derivatives litigation to relate back to the 2003 IRS investigation, to be deemed treated as a single claim subject to a single retention under the policy. So the interesting question, which would apply? So you have the original one's $3 million. We contend the follow-on case is $1 million if each were to be singled together. In a relation back situation, which one should apply? Twin Cities' position is the amount of the self-insured retention is fixed by the first case. If it's $3 million in the first case, it should be $3 million for any subsequent case, even if it doesn't relate to the selling of municipal bonds. And they're saying that it would be an absurd result otherwise, because how could you have a $3 million retention that changes to a $1 million retention when the second case is filed that doesn't relate to the seller, that relates back? The single self-insured retention that should apply should be $3 million. Our position is that you have to look at the related wrongful acts that are to be treated as one claim. If those related wrongful acts don't relate to underwriting of municipal bonds, then the $1 million self-insured retention should apply. The bottom line is that here we have a situation, and we don't believe that that's any less plausible than their position. I would guarantee you that if we flip the order, that the derivatives litigation was filed first, it's setting a $1 million bar and then you had the underwriting come second outside the policy period, the IRS investigation, with $3 million, I guarantee you Twin Cities would be advocating exactly the opposite position, that of course a $3 million self-insured retention has to apply to the second case. Whatever is set by the first case doesn't matter. It would be outside the policy period. It wouldn't be covered. Well, it would if the IRS investigation also involved bid rigging, and the derivatives litigation did as well, then it would still relate back. But the only reason there's coverage for the... Oh, okay. So the question is if both sides are equally plausible and there's no law, we believe under Missouri law you apply the rule that in the event you've got equally plausible positions, you should adopt the construction most favorable to the insured. Judge Sachs says the parties do not dispute that indirectly or in consequence of the underwriter or seller activity this controversy arose. Do you agree with that? We don't agree with that as to the derivatives litigation. Why would he say it's not disputed? I don't know, because we certainly did dispute it in our briefing below. Well, that's a fact finding. It's true. I will say it's true. Tell me why he's clearly erroneous. Well, because if you look at the allegations of the derivatives litigation, which we set forth in our brief, the only wrongdoing that's alleged has to do with their alleged bid rigging as bidding agent. There's no wrongdoing alleged with respect to any role they may have played as the underwriter. You're arguing that the fact, I'm arguing that, I mean, my point is he says you did not dispute that in the district court. Well, we did. I don't know what else to say, but we did. So we would find that in your briefs or in any record? Briefs below. I think the briefs below were included as part of the appellate record. Did you argue it? Yes. I mean, oral argument. Yeah, I mean, did you have oral arguments? No. No. It was submitted in the briefs. So the place to look for it would be in your briefs? Right. Right. I'm out of time. Are there any questions? Okay. Thank you. I think, Mr. Lemley, you're out of time also, unless there's something that's just burning here. Could I just make one point on the last issue that you were discussing, Your Honor? Okay. I gave you one minute. Thank you, Your Honor. On that issue, I think Judge Sachs was saying that the derivatives litigation, even standing alone, would be subject to the $3 million retention. And if you look at page 10 of Baum's opening brief, how they describe the derivatives litigation, it shows why. There were 23 municipal bond transactions here where Baum acted as the underwriter and seller, and it also sold the municipal derivatives. And the alleged wrongdoing in both the IRS investigation and in the derivatives litigation was that Baum diverted profits from the municipal derivatives by the cost of issuing the municipal bonds that it was underwriting and selling. The IRS investigation, the IRS said that money should have gone to the government. The derivatives litigation, the municipalities said the money should have gone to them. But the wrongdoing was the diversion of municipal derivatives money to pay the cost of issuing the municipal bonds that Baum was underwriting and selling. And if you look at their description on page 10 of their brief, the allegations of the derivatives litigation is that Baum illegally diverted profits on municipal bond deals. And it goes on to explain those were the same 23 municipal bond deals that were at issue in the IRS investigation. That's why Judge Sachs said it's clear that even standing alone, the derivatives litigation would be subject to the because it only has to in any way relate to Baum's actions as an underwriter and seller of municipal bonds, and Baum was actually underwriting and selling all 23 of the municipal bond transactions at issue in the derivatives litigation. I think we understand your argument. Thank you very much. Thank you for your time. We will take it under advisement and be back in due course.